United States v. Hart, Sharpe, and Davidson. Hold on, Mr. Bryan. Yes, Your Honor. Mr. Bryan, good morning. It's still morning, right? Yes. Good morning, Your Honors. May it please the Court. I appear on behalf of Mr. Hart, and I'd like to discuss with this panel this morning the issue of the shackling of the defendants. Now, my argument is also made pursuant to agreement with counsel for Mr. Sharpe. It is made also on behalf of Mr. Sharpe. I'd like to discuss three reasons for reversal on this issue. First, that there were no findings by the district court that shackling was necessary as a last resort. Second, that there were less restrictive methods to accomplish control of what was the behavior that was at issue in this case, such as warning and threat of removal. And third, that there was evidence, sufficient evidence, to have warranted a hearing on whether the jury saw or heard these shackles. And in the alternative, regardless of whether they were seen or heard, there are other important concerns reflected in Supreme Court precedent that would require reversal in this case. To wit? To wit. Of other concerns? Yes. Well, in Supreme Court, as alluded to, for example, the presumption of innocence. And the presumption of innocence is affected by, for example, when there's a decision to shackle, and let's say the we're dealing with a situation where it has not been a last resort, that there is a violation of that rule. Nonetheless, it's a judgment by the court as to this defendant that they are effectively necessary to be chained. And if you look at it from the viewpoint of a defendant in that situation, that defendant is drawing the conclusion that the judge thinks they're a bad person, and likely a non-lawyer is going to think that judge already thinks I am guilty. Is there any evidence? What we're concerned about here in all of this, and it's obviously of concern to all of us, regardless of which side of the courtroom we're sitting on, or which side of the bench we're sitting on, is conveying an impression to the jury that essentially predisposes them or has the effect potentially of predisposing them to find the defendant guilty, right? Well, actually, it is a broader issue, and that's what I am saying. And I am referring to Supreme Court opinions. And, for example, in Allen, there are reasons for why shackling must be a last resort. So, say, for example, this is something that also affects the dignity of the court itself. Unless a court is – and the courts are strongly adhering to this rule about last resort, I mean, there's – obviously there are situations where it must be done, but it has to be a last resort situation. It can't be a situation where something can be remedied short of that. Because it becomes – it actually – I would say that it denigrates the view of the citizenry of a court if shackling is done too easily, not as a last resort. Here, in this case, we had shackling as a first resort. It was immediate shackling and actually not justifiable. But it wasn't based – you know, it wasn't – the reasons weren't made up out of whole cloth. I mean, there was – there were incidents that had occurred. Well, again, yes, we're dealing with incidents, but what were they? And I really thought it through, and if I can present this as simply as I can to view what we're dealing with with behaviors of a defendant, what would create a concern for a court. And it seems to me that there's a spectrum. And the spectrum on the less severe side of the spectrum, you're talking about defendants who exhibit some kind of misbehavior, verbal, some sort of disruptive, but it's not on the other end of the spectrum, which is really where the greatest concern you see in the opinions with shackling. And that is the risk of a defendant attacking someone in the courtroom or that the defendant would escape. In this case, we are on the least severe end of the spectrum. We have behavior that happened with the marshals in transport. It did not happen in the courtroom. And, in fact, we have proof here, evidence anyway, of this case, that it likely would not have occurred in the courtroom because the first day they were not shackled. The judge didn't feel shackling was appropriate and only ordered shackling on the misunderstanding of law that because the marshals had recommended it, the court would do it. And that was a misunderstanding. I would say it created a problem, frankly, for the court. Here, then he's shackled and he's shackled the defendants. And by the third day or the end of the second day, he's realizing he has a problem and then having to go back and justify it. I'm just relying on Judge Berman's written order. He describes cursing, spitting, loud physical outbursts. And he also describes his own observations from conferences where he found that the defendants appear to have issues maintaining self-control. Yes. Well, we've discussed what this behavior was with the marshals during transport. It did not happen in the courtroom. And then it's some type of vague. I can't – it's a vague description of some type of behavior dealing with, it seems from what I can see, is that the defendants somehow inappropriately talked to their family or the public in the gallery while the trial was proceeding. It seems that was what the judge was alluding to. But it is very vague. The most important thing about it is, Your Honor, is that – I mean, this – if we compare this case to the Supreme Court decision in Allen, this doesn't even make it as close to that decision. And in that decision, the Supreme Court said it was a situation in which the judge warned and then – warned repeatedly and then said, if you do not behave, you will be removed. And the defendant wouldn't behave. And then the court then says, okay, remove, but if you behave, I'll let you back in. Defendant comes back in later, won't behave. Okay, you have to remove. Says, if you behave, you'll come back in. Comes back in finally, says, I'll behave. And then – and by the way, what was said by the defendant in that case was vastly worse than what we have here. We have that defendant threatening the judge, you will be a corpse with this trial proceeding. That's a threat of physical attack. So the point is that with this standard we have – and it's a very important standard. We're going back hundreds of years of why shackling should not happen. It's an abhorrent kind of a caged animal. We chain animals. So we need to – we have to be careful. If something less than shackling will work, this Court and the Supreme Court says you must do it. We have proof in this case, warning and threat of removal from the courtroom would work because specifically, Defendant Sharp, Appellant Sharp, on the third day of trial, it was brought out that he had made this gesture toward the prosecutor during the opening statement of the prosecutor in response to the prosecutor pointing at him. The judge said, I know Mr. Sharp will behave. I know that if I just warn, that will be sufficient. Counsel for Sharp, talk to your client. Tell him that he will – no more misbehavior or I will remove him from the courtroom. He'll view the trial from his cell. No misbehavior after that. So it's – this was clearly a situation, if there was any concern about, you know, that something had to be corrected, that actually the least restrictive means, which was warning and threat of removal, would have worked. One last thing to say. I see I'm on the time here. But we have this Court's decision in Haynes, an extremely important decision. And that decision says that there must be this specific finding on the record by the judge, that the judge has determined that shackling was necessary as a last resort. In other words, it was the only thing that could be used to control these defendants. There is no finding here. And this – and in Haynes, this Court said – and I know we had the discussion about whether the jury saw it or not. In Haynes, that issue, the government made the argument, well, the jury didn't see it, didn't see the shackles. This Court – now, then they also said in Haynes that the defense counsel during the summation did mention it, that he was shackled. And so then the question became, should it be referred back to the district court for an evidentiary hearing as to whether the jury saw the shackles? And this Court in Haynes says, no, this is automatic reversal because there was no finding. And if you think about it, it reflects the gravity of this situation, and it also affects the appellate's review of such a grave and important question that affects this Court system. So for multiple reasons, also what I've stated in the brief, I respectfully submit that we must reverse on this issue. Thank you. Thank you. Excuse me. I'm having trouble talking. Thank you, Mr. Brown. Good morning. Good morning. May it please the Court. Robin Smith for Appellant Sharp. I'd like to divide my time with my co-counsel, Leigh Ann Othman, who will address the supervised release issue. So I'll be stopping in about four minutes. The district court's decision to permit evidence regarding the 2009 arrest statement that Sharp would bust the officer's melon, meaning blow their heads off, was irrational. And that's the standard that this Court has to find. And the government and Mr. Sharp agree that the Court would have to find that the admission of the evidence was irrational. The government is trying to argue to the Court that the error should be reviewed under plain error review because defense counsel didn't specifically say that it was a death threat. However, defense counsel said at the hearing that the evidence was gratuitously inappropriate and inflames the jury. So this Court should find that harmless error review and irrational viewing whether the admission of the evidence was rational or not should apply, not under plain error standard. The testimony that Mr. Sharp threatened police officers was egregious and completely different from any of the evidence at trial. It was a harrowing type of situation. Mr. Sharp was in the pens at the precinct, and he said that if that gun was loaded, he would have bust the officer's melon. There was no probative value of this testimony to any of the evidence at trial. And the evidence was weak. We're not here saying that the jury could not have found Sharp guilty of the crimes that he was convicted of, but the evidence was very weak of conspiracy. Mr. Sharp was a street seller. The Bando was an organization of street sellers. But there was testimony that the sellers were loan sellers like the Wild West, for example. The government said in their brief that it was Mr. Sharp who gave his blessing so that McKenzie could sell there. That was not true. McKenzie said that you had to have been known around the Bando for a long time in order to sell there, and that he knew Sharp for a long time. But there was no explicit evidence that Sharp gave his blessing to sell there. The government said that the defendant was an enforcer. There was no evidence that none of the witnesses connected any of the shootings to the drug trade. And, in fact, they explicitly said that the shootings had nothing to do with the drug dealing. McKenzie was asked who made the decisions about who would sell, and McKenzie said nobody. We kept our drug business to ourselves. So aren't these all issues, though, or views of the evidence that the jury, to sort out? Yes, but I'm not arguing that the evidence was insufficient. We're arguing that the admission of evidence regarding Bust the Officer's Melon was unfairly prejudicial, and it was worsened. In the context of that argument, I'm sorry, in the context of determining whether your client was participating?  I mean, it painted a very awful picture of him, and then the error was compounded by the Facebook evidence characterizing him as Savage. The prosecutor, what should have happened, I'm sorry. Savage was a nickname or something? It was something that was said on Facebook, but it was never listed as a nickname. He was called Dummy as a nickname on the indictment and versions of Dummy, but nothing about Savage. So that was also irrationally admitted into trial. In fact, the district court said that the government's case was weak when during the discussion of the Facebook evidence coming in, the government's, I mean, sorry, the court said the government needed to do more foundational work. The government's case could be stronger. They need to focus on the three defendants because they only had scattershot mention of the three defendants in court. The district court said, I urge you to get more evidence of conspiracy. What would have been irrational in this case, Your Honors, would have been to separate the evidence, the part of the evidence that dealt with Mr. Sharp being with the gun and with the co-defendant and completely extracted the evidence about the Mellon threat. Even the government says that those aspects of the 2009 arrests were completely separate. And I'll let Ms. Offman talk about the supervised release. Thank you. Thanks. Good morning, Your Honors. May it please the court, Leanne Offman. Sorry, could you give me the spelling of your name, please? Yep. L-E-E-A-N. Last name O-T-H-M-A-N. Thank you. I just wanted to put it on the note. No problem. Your Honors, Judge McMahon's standing order as it relates to appellant's condition of supervised release is unconstitutional as it is overly broad and vague and has not been shown to relate to appellant's personal history or characteristics. In this case, the condition stated that if the probation officer determines based on your criminal record, personal characteristics, or history that you pose a risk to a third party, you may be required to notify that third party of that risk. However, this still leaves us with the question of what was met by the term risk. This overly broad and vague term allows no limitations on the court and probation officers and does not provide appellant with notice of what behavior he should be avoiding in order to prevent a probation officer from seeking any court approval. This court held in United States v. Donahue that although a court's discretion is broad in terms of imposing special conditions on defendants, it is not untrammeled and this court will carefully scrutinize unusual conditions. The condition in this case did not specify what risk relates to appellant 3553, which requires special conditions must be reasonably related to factors such as a defendant's personal history and characteristics. The standing order did not reasonably relate to any particular defendant and violates the requirement that a condition must not involve any greater deprivation of liberty than reasonably necessary to achieve the purposes of sentencing. This unfettered discretion allows courts and officers to act at their whim in relation to appellant's personal and professional life. And for these reasons, we respectfully ask that the court invalidate this order and remove it from appellant's judgment. Is there a way this order could have been framed that would be acceptable, that would be, that should be upheld? Well, to begin, I think they should have provided examples of what risk appellant in our specific case could have, basically. What risk your client could impose. Exactly. On somebody else. On a third party, exactly. Okay. But wouldn't you be here if that were the case, arguing, well, those are examples, but there are things outside that and what if he does this and what if he does that, and that's still not clear enough? While it could still be interpreted as being broad or vague, I believe just the term risk itself gives no indication or notice to give a fair chance of what behavior should be avoided overall, what things they should be staying away from. I mean, there is nothing that was even specified of what risk could relate to his personal history and his personal characteristics. But why isn't the fact that this, it's not the probation officer who's imposing this. Probation officer's recommending it to the court. The court's not going to impose it without a hearing where the client, your client is represented by counsel, and that can all be ironed out then. Why isn't that sufficient protection? Well, the term, again, risk is just completely vague. I mean, based on his criminal background, his criminal history, based on the conspiracy allegations, he could, I mean, I'm sure he's going to be involved during his supervised release term. He's going to be involved with many people, many acquaintances, and there's no indication of what type of behavior he should be avoiding. What may be appropriate for him to act a certain way may not be seen by the court to be something that's appropriate or by a probation officer. Thank you, Ms. Hoffman. Thank you. Good morning, and may it please the Court. My name is Dan Perez. I represent Ray Sean Davidson. I'd like to devote my comments this morning to the second point of our brief, which deals with the issue of the abuse of discretion by the district court in precluding the defense from inquiring of the officers, officers Williams and Whalen, regarding their prior disciplinary histories, both, excuse me, both during the suppression hearing itself and also during trial. Williams had a prior history that was very, very similar to this case. Now, you have two district court judges who agreed on the issue, Judge Torres and Judge Berman. Judge Berman essentially said, for the same reasons I'm going to preclude you from examining at trial. Yes. Yes. So I'm challenging both. I understand that. I am. Williams had a very similar incident in the past that was substantiated by the CCRB. It was a bulge. It was a street stop. It was an improper frisk. And then it was followed up. It's not just the stop itself or the frisk. It's the fact that there is this apparent pattern of failing to fill out paperwork after the stop documenting it. Whalen, it was a car stop. And then it was an improper frisk. And then it was a failure to fill out a stop and frisk complaint. And it matters in this case. This was not simply an academic exercise of saying let's go fishing and see what we can find out about the officer's credibility. It matters in this case because Williams and Whalen's versions of how this stop took place were so inherently contradictory, self-contradictory. For example, they couldn't get on the same page as to whether Davidson struggled while he was being searched or while he was being arrested. Initially, in the Bronx criminal complaint, the allegation was he struggled while he was being arrested. Then in the Federal complaint, it was he struggled while he was being searched. And then at the hearing and the trial, they denied that there was even a search. It was he was arrested. They couldn't get on the same page as to where the stop took place. They were a block apart and not a street block, an avenue block. Under one version of the events, it was 213th and Holland. Under another version of the events, it was 213th and Carlisle. So if they can't get on the same page themselves, and I'm not just talking between the two officers, but the officers themselves gave utterly incompatible testimony, for example, one of them gave one version in terms of where this happened at the hearing that didn't pair up with his own memo book entry. I believe that that was Williams. And if we have police officers who in the past aren't following the rules regarding memorializing disciplinary or, excuse me, memorializing stops and frisks, and if we have police officers who there is reason to believe have failed to heed Fourth Amendment safeguards of residence, then why would we presume that we can trust that they're going to honor their oath to testify truthfully? And so in a case such as this, it's even more important to permit the defense to probe into those previous complaints. I also want to touch on the issue of harmless error, because I think it is an issue that the government raised, and it's a fair point. The case here was premised predominantly on cooperating witnesses. There were two or three cooperating witnesses. But in the case of Davidson, all of this telephone evidence did not apply to Davidson. None of the wiretap evidence applied to Davidson. There was also other evidence such as surveillance evidence. There was a poll camera that went up. And none of that applied to Davidson as well. And so the jury is sitting there saying, okay, well, do we believe these cooperating witnesses? And how do we know whether we should believe these cooperating witnesses? Well, in walk these police officers in their uniforms, with their badges, talking about how long they've been a police officer. Juries routinely vest enormous trust and confidence in the police for good reason. We want to believe that we can believe police officers. And yet there was a fiction here, in a sense, because the jury was precluded from hearing that in the past, these officers had not, had been disciplined or had substantiated investigations regarding similar stops and similar frisks. So I think there were four cooperators, but I want to make sure. Henry, McKenzie, Finley, and Clark. That is correct. Okay. I was never good with numbers, Judge Koh. I apologize. It's why I went into the law instead of becoming an airline pilot. I also, with reason to. Let's do plaintiff's work, then, if you're not good with numbers. We also have a similar issue, which I will acknowledge I have a forfeiture problem, and that is regarding the cell phone video. And this is a very bizarre, bizarre explanation. The officer had this cell phone video that someone gave him, some interested party, that allegedly corroborated everything that he says happened. And he doesn't voucher it, and he doesn't back it up, and he doesn't safeguard it. He's driving around in his car on the streets of New York City with it on his lap, and he gets out of the car for another stop of a totally unrelated incident, and the cell phone tumbles off his lap into the street, and then it gets run over by a car, and he goes back, and he sees, and I'm sure you're familiar with what happened from my brief. But then he throws it out. And so, again, I'm back to why should we believe these two guys, and how can we know that the jury had a fair shot at probing their credibility if all of these past incidents were kept out? Thank you. Thank you, Mr. Perez. And each of you, as appellants, have reserved some time for rebuttal. We'll hear from Mr. Scotton. Thank you, Your Honor. Good morning, and may it please the Court. My name is Hagen Scotton. I'm an assistant United States attorney in the Southern District of New York. I represent the government here, and I also represent the government in the district court. I actually want to start with the issue of the order, just because I think it can be cleared up very quickly. I think appellants are actually just misreading what Judge McMahon said. At present, Sharp is literally subject to no order. And I see where the confusion comes in. You can actually see this order on the very last two pages of the red brief. Okay. So I think the Court already knows what I'm saying. Judge McMahon sort of provided a way in which district courts could impose a new order if they wanted. Judge Berman hasn't done that here. There's just no order right now, so there's no issue before the Court. So as he stands, that special condition is not? It's just not there at all. Perhaps Judge Berman will want to reimpose it, and if so, he can be heard in that court. So having done with that, I was going to move on briefly to the shackling issue. I do think that Mr. Hart is wrong in suggesting there are concerns here that would be implicated, even though the jury did not see the shackles and there's no indication they did. Deck, in particular, addresses three concerns. One, impairment of the presumption of innocence, but as Your Honor said, Judge Hall, specifically in the eyes of the jury, not that the defendant is going to sit there and feel guilty. Of course, he's being led back to jail every day already. It's for the jury. Second, and my adversary mentioned this, the dignity of the courtroom. But again, that's not in a sort of esoteric sense. It is, and this is how Deck describes it, what people will see when they walk into the courtroom. If nobody sees the restraints, no one is sitting there saying this is not how justice should be conducted. And the third was interference with communicating with counsel, which brings me to the point I really want to make is these opinions, Deck, Allen, on which he relied, are about total restraint. They are literally, say, bound and gagged. That, of course, would interfere with your ability to communicate with counsel. But that wasn't even close to what happened here. Those are the sort of things where there's this argument about, should that be the very last resort, although I do say it's an argument because there's a lot of opinions, including from this Court, that suggest the last resort is removal from the courtroom. I think they're both serious remedies. And I think if you look at Deck and other cases, it's sort of, it is going to be within the district court's discretion which of these two remedies is necessary. You can't really say either is a last resort. And on that point, I just wanted to hit two brief areas that Hart emphasized. The first is this idea that there were no warnings. Actually, there were. If you look at 278 on the district court docket, this is a December 6, 2016 conference. Judge Berman specifically told Hart and Sharp, you've behaved badly in the past. If you keep behaving badly, I'm likely to order you removed from the courtroom. So it is not as though no warnings have been given. Secondly, I want to push back a bit on this notion that Judge Berman expressed an opinion that Sharp's lawyer could control him. At that same passage, and this is on page 83 of Hart's appendix, where Judge Berman says to Sharp's attorney, you know, I know you can control him. Sharp's attorney essentially says, I'll try. And he specifically asks that people in the courtroom not do things that everyone does, like make eye contact with Sharp, and that the prosecutor not point him out when addressing the jury. This is not a statement of a lawyer who has control of his client. These are things that can happen in a courtroom, and you shouldn't say someone's under control when the lawyer says, I don't know if I can control him, if you do these normal things. And third, I point the Court to Docket Entry 444, which is another transcript of a different pretrial conference, where Sharp's lawyer says to Judge Berman, with Sharp not present, I'm going to need your help in controlling my client. He doesn't listen to me. Maybe Your Honor can tell him not to act out in court, because when I tell him, it doesn't go over well. So this idea that Sharp's lawyer had this key to control him is simply not accurate. And the final point I wanted to hit on that subject, Your Honor, is Haynes. I do think my opponent is just misreading Haynes fairly gratuitously when he says there's an issue of automatic reversal. It says nothing of this sort. This Court was clear beforehand in cases like Hamid and Davidson, and clear afterwards in Harper and Lee, that if the jury doesn't see the shackles, you're not going to do it. DEC itself remands for harmlessness inquiry. And this is what Haynes actually said. It is unnecessary to remand this case for a hearing as to the necessity of trying the defendant in shackles, and when the jurors became aware of the shackles, not, as my opponent says, because there's automatic prejudice, but because as explained below, this is at page 190, the cumulative effect of all the errors in this case denied the defendant a fundamentally fair trial. If you look at Haynes, the Court found a lot of errors having nothing to do with shackling and said, look, we're remanding and reversing and there's going to be a new trial anyway, so we're done with this issue. It just doesn't support the proposition that there be any reversal without visible shackles. And then the last issue I plan to cover, subject to the Court's questions, was just very briefly on the 2009 statement. First, I think it is reviewed for plain error to the extent what Appellant now wants to argue is this was a death threat. If they wanted to reprise the arguments from the district court that this was about anti-cop sentiment, that was preserved. I think that's wrong for the reasons Judge Berman found. This idea that it's a death threat is, one, reviewed for plain error. Two, it's wrong. Somebody sitting in a jail cell in what was, in fact, far from a heroine situation – Sergeant Glover's testimony about this was bordering on boring. He's sitting there operating a fingerprinting machine next to a holding cell and Sharp tries to yell at him, something that is clearly, as his attorney characterized it in his closing statement, braggadocio, just being a jerk while he's behind the cell. This was nothing like a death threat. It was, however, probative for a very specific purpose. Mr. Sharp's attorney argued that this gun was not – did not belong to him, that it belonged to one of his co-conspirators. And so when Sharp says not just I would have used the gun, but I would have used it if it was loaded, he was very clearly acknowledging possession of the firearm. Because, of course, how would he know it was unloaded, which it was, unless he had had some knowledge of it, unless he could use it. I did want to make one small correction in our – in our brief. We gave the wrong transcript site to where Sharp's attorney made that argument in closing. It's, in fact, at 1625 to 26 of the transcript. He also brought this out on cross-examination of Glover. So showing Sharp saying, I would have used this gun, and effectively, I know it's unloaded, was extremely probative and not terribly prejudicial, given that there was testimony of Sharp actually committing at least three separate shootings in which he actually shot at people, and he was heard on tape repeatedly discussing shootings by the conspiracy, and in one instance saying he was going to put bullets through the door of an occupied building in order to collect a drug debt. Given that, this sort of empty threat from a jail cell was not prejudicial, but it was probative to show that this gun here was connected to him. Subject to the Court's questions. Scalia. Yeah, just – I know you've written your views on the preclusion of the cross-examination or the examination of the officer witnesses about what had happened to them and their history, essentially, with the client. Sure. So I can, without going into specific incidents, although I'm happy to if Your Honor wants to, in general, what you have is incidents that were, first off, not related to this case, as in these are arrests of other people, no connection to the conspiracy, et cetera. And second, as Judge Torres found and Judge Berman adopted, did not bear on credibility. In no instance were any of the officers shown to have lied. And they made arguments below saying, well, for example, Williams relied on a bad search warrant, but he didn't swear out the search warrant. It was sworn out by a detective at a time when he was just a police officer. No reason to think he had any idea that when he got pulled onto this search team, it was a bad search warrant. Or, for example, Whalen participated in a traffic stop. One of the debated issues was, was there a traffic infraction, and the CCRB went against him, but Judge Torres accepted correctly that had the board found him not to be lying. And so the board's opinion of the facts, not finding either party to be lying. And those results are entirely consistent with this Court's opinions in both Laws and Tarrant, the former of which is a published opinion. In Laws, there actually was an adverse credibility finding against the officer, and the Court still said as a matter of 403, it's such a remote incident, has nothing to do with this, it doesn't show a propensity to lie, I'm not going to let it in. Tarrant, I think, was more of a 608 ruling, which I think is appropriate here, that just, these aren't relevant, they're not about this case, and they're not about credibility, so they shouldn't come in. So first off, I don't think you could say that Judge Berman abused his discretion. I won't get into it, but I do think had there been a mistake here, it would be harmless. I do know what Mr. Davidson's counsel was saying. The fourth cooperator didn't know anything about Davidson, so there were three cooperators against his client, but there were three, there was his own cell phone messages talking about selling crack, there were Facebook images of him, there were his Facebook posts saying things like, everybody who's been arrested needs to stay quiet, we'll all get a drug program, we'll be out in three years, it's a minor setback. Those were his own words on Facebook, saying people need to be quiet, talking about the conspiracy's locations, when the police would search them, what they should be worried about. He was very obviously guilty, and to the extent that he needed to cross-examine those, that any cross-examination of those officers could have mattered, I mean, the Court should reread the cross-examination his very capable trial attorney did. They had a ton of material to cross these guys on, including, for example, not making the entries were actually not made in this case. And there's all sorts of reasons we had why you wouldn't expect that in a log, but still, everything that they needed to do a cross, they had. Thank you, Mr. Scott. Thank you, Your Honor. Mr. Brine, you've reserved a minute. Yes. Thank you, Your Honors. The government made one argument with respect to shackling and warning, and saying, well, there's no guarantee that a warning will work, and then, if you think about the logical extension of that, therefore, warning, don't give warning, you have, that's not good enough. Well, of course no one can say whether a warning will work until the warning is given. That's exactly what happened in Allen. Actually, it didn't at first work in Allen. It took a couple of times of warning for it to work. So that is a logically not acceptable argument for why you didn't warn. Second thing I would say is this argument about removal from a courtroom. Well, I simply say, a reading of the Supreme Court precedent on this incredibly important issue about shackling over the decades, removal is a step short of shackling. Shackling is the last resort. There's no question. The government has to argue this, because if it were to concede that removal was a step short of shackling, then there's been a violation. But it is removal is clearly a step short, a less restrictive method than shackling. It strikes me, however, that that issue may not be as clear as you would like us to have it, to have us take it, in that it surely impedes communication with counsel. And we've all had, I'm sure everybody here has had cases where we've experienced the removal or threatened removal of defendants, and they've had to calm down before they can get back in and participate in their trial in a more productive way. And there are, and it's covered in my brief, but other methods. So there's threat of contempt. You see if that works. They can get longer time. There's the ability to put more marshals, more security in a courtroom. This is something, again, covered by Supreme Court precedent. There are less restrictive methods that should be looked at, and there has to be then saying, no, they won't work. But we, as I said, we're at this lowest end of the spectrum in terms of disruptive behavior, and we have evidence in this record that a warning would have worked because it worked with Sharp. Thank you. If I may, the idea of the, I know, but I think this is very important. Just because a jury doesn't see, well, when a jury goes out, the public sees. And we're talking about something more broad than just whether a jury sees. We're talking about how, in general, over a period of time, the citizenry understands how the court works and deals with defendants. Is it going to just shackle routinely? And it's okay, just as long as the jury doesn't see. The last thing I would say is if you think about it as a method of enforcement, you must enforce. You can't just simply say that the jury, well, it's okay, just as long as the jury doesn't see it, because what does that open the door to? But you can have routine shackling, and just as long as the jury didn't see, it's okay. Thank you. Thank you very much. Ms. Miller. Sorry. The reason that the government does not want the court to consider the bust, the officer's melon comment as a death threat is that this court said in 1993 that death threats should be scrutinized because the stakes are heightened with death threats. Again, defense counsel did not just say it was anti-cop sentiment. He said it was gratuitously inappropriate and inflames the jury, and the court should not look at the death threat by plain error review. With regard to the government's claim that the testimony was appropriate to show that Sharp possessed guns, they really didn't need that testimony to show that Sharp possessed guns. There was plenty of testimony at trial, and all this did was serve to present propensity evidence, which the Supreme Court has said denies the defendant a fair opportunity to defend himself, and it weighs too heavily as character evidence. Are there any further questions? No. Judge Witter? No. No, thank you. I'll rely on the brief. Thank you. Thank you, Ms. Smith. Mr. Perez. So I appreciate the government coming to my defense. It was Clark who did not know Rayshon Davidson. And I'll return the favor by amending our position in the briefs. The portion of the evidence that was precluded regarding the warrant, the entry of the apartment without a valid warrant, I agree. That should have been excluded, because whether it was Whalen or Williams, he did not personally swear out the warrant. So I don't have an issue with that. What I do have an issue with is the prior incidents that were similar to this case. With respect to Tarrant, it's important to note not only is Tarrant a summary order, but Tarrant, the big difference between Tarrant and this is in Tarrant, the CCRB did not substantiate the prior investigation, whereas here, the CCRB did substantiate. And one of the difficulties that I had just as a lawyer with briefing this issue and preparing for this argument is we're all relying on laws which is a, I believe, a 2002 case, which is not to say that simply because it's old, it's no longer good. But we know a lot more about how the NYPD conducts stops and frisks on the streets of New York City today than we did 18 years ago. We have better information, we have more information, and it would perhaps be helpful to all of us for the court to revisit these questions. In laws, there was, it was a paragraph of analysis and it just said, the proposed cross-examination was of little, if any, plausible relevance to Ben Ciavago's credibility. The review board's prior finding provides nothing of value with respect to his motivation to lie about the circumstances of the appellant's arrest. Well, why, is my question. And why does it have to be so limited in terms of, if there's a complaint that's substantiated that he lied, well, that comes in. But if it's a complaint that's substantiated that he made up, excuse me, that he improperly stopped somebody and improperly searched somebody, then again, I ask the question, why should we have faith in his oath to tell the truth, the whole truth, and nothing but the truth? Thank you. Thank you. Thank you, Mr. Perez. Thank you, all, one, two, three, four, five of you. The arguments are much appreciated. We reserve decision in this case.